COURT OF APPEALS OF VIRGINIA


Present:   Judges Benton, Haley and Senior Judge Annunziata
Argued at Alexandria, Virginia


ADHAN MALDONADO, S/K/A
  ADAN MALDONADO

                                                            MEMORANDUM OPINION[*] BY
v.        Record No. 2384-05-4                    JUDGE JAMES W. BENTON, JR.
                                                                    DECEMBER 28, 2006

COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
                          Burke F. McCahill, Judge

            Bonnie H. Hoffman, Deputy Public Defender, for appellant.

            Alice T. Armstrong, Assistant Attorney General (Robert F.
            McDonnell, Attorney General, on brief), for appellee.


        A jury convicted Adhan Maldonado of aggravated sexual battery.  Maldonado contends the

trial judge violated his right of due process by refusing to place his witness subpoenas under seal

and further erred by failing to set aside the verdict after an *ex parte* communication occurred

between court personnel and the jury during deliberations.  We hold that that the trial judge did not

violate Maldonado's due process rights by not sealing his witness subpoenas.  We agree, however,

that the *ex parte* communication obligated the trial judge to set aside the jury verdict.  Thus, we

reverse the conviction and remand the case for retrial.

                                                    I.

        A month before the trial, Maldonado's attorney filed a motion to seal her witness

subpoenas.  Arguing the motion, Maldonado's attorney contended this was a due process issue

because the Commonwealth was not required to disclose its witness list to the defense and "the

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

playing field should be leveled." The prosecutor indicated she already had filed the Commonwealth's returns of service identifying her witnesses and the returns were available for viewing in the courthouse. The trial judge denied the motion.

The evidence at trial proved Maldonado went to his nephew's house one afternoon for a social gathering of friends. While the guests were eating and mingling around the deck at the rear of the house, Maldonado was pushing the four-year-old child of his nephew as she sat in a rope swing. The swing is a single piece of rope tied in a loop and hung on a tree next to the deck. Later in the evening after the guests left, the child's parents noticed blood in the child's underwear. They took her to the hospital the next day. The nurse examined the child and found a small laceration on her genitalia. The nurse testified the laceration was abnormal but she could not say what caused it.

Investigator Craig and Deputy Giron arrested and interviewed Maldonado. Because Maldonado spoke Spanish and Investigator Craig did not, Deputy Giron acted as an interpreter. Maldonado agreed to talk to the officers and signed a waiver of his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). Initially, Maldonado informed the officers that he did not remember anything from the party because he was intoxicated. Later in the interview, the officers told Maldonado that a nurse found a cut on the child's genital area and that the nurse had medical proof he had caused it. They suggested it may have occurred accidentally. Deputy Giron testified Maldonado responded, "he was drunk and he couldn't remember, but he said it's possible he did open her pants, went down her panties, and rubbed her vagina area." After this admission, the officers asked Maldonado if they could record the interview. The officers then recorded the last twenty minutes of the two-hour interview.

During Deputy Giron's testimony, the prosecutor played the tape, and the deputy again translated the Spanish portions of the tape, explaining where he deviated from a literal translation

of Investigator Craig's questions and how. On the tape, Investigator Craig asked questions in English, Deputy Giron asked the questions in Spanish, Maldonado responded in Spanish, and the deputy repeated the answers in English.

Maldonado's attorney objected that the deputy's testimony concerning the Spanish spoken on the tape was inaccurate and further that the deputy's Spanish translation as recorded on the tape was also inaccurate. The trial judge then directed a court interpreter to translate the Spanish portions of the tape. Concerned about whether the officer was "summarizing," the judge indicated the translator would "just say, I heard this sentence in Spanish, stop, this is what it means, the defendant's reply, translate it to English, and let the jury decide." After the deputy had concluded his testimony, the interpreter played the tape before the jury and orally translated the Spanish portions.

Several defense witnesses testified they saw Maldonado pushing the child and her brother while they were on the swing, but they did not see him touch the child inappropriately. Maldonado testified that he pushed the child and her brother while they were on the swing. He testified he did not remove or unfasten the child's pants and did not touch her genitalia. He explained that, during the interview, he denied the officer's accusations nine or ten times. He said the officers then informed him that they had proof he hurt the child and that, if he confessed, he could go home. Maldonado testified he told them what he believed they wanted to hear because he was afraid the officers would physically attack him.

During closing argument, the prosecutor referred to Maldonado's confession in the interview and the contents of the recording, which was an exhibit. The prosecutor also referred to specific questions the officers asked Maldonado and told the jury the following:

> You all heard the tape played to you, and you'll be able to, if you so desire, to hear it again back in deliberations. Listen to the tone of Deputy Giron and Investigator Craig on that tape. Listen to the tone of the defendant's voice and determine for yourselves

- 3 -

whether or not you think his will was overborne and he was forced
into making the statement to the police.

During her closing argument, Maldonado's attorney argued that the other guests at the party would have seen something suspicious if Maldonado had committed the alleged act. To support the contention that Maldonado made his statement not because it was true, but out of fear of the police, Maldonado's attorney emphasized the leading questions the police asked during the taped portion of the interview and Maldonado's mirrored responses. Maldonado's attorney also emphasized that the jury's determination of the contents of the tape and the interpretations were critical issues.

At the conclusion of the arguments, the jury received the tape and other exhibits in the deliberation room. The jury convicted Maldonado of aggravated sexual assault. The trial judge imposed the jury's sentence of four years imprisonment and gave an additional year of post-release supervision.

Maldonado's attorney filed a motion to set aside the verdict and for mistrial, based on an *ex parte* communication between court personnel and the jury. The prosecutor did not contest the allegation that the jurors asked for an interpreter during the deliberations to interpret the Spanish portion of the exhibit that recorded the interview. Court personnel denied the jury's request without communicating the request to the trial judge or either party. After considering the arguments, the trial judge said he would not have allowed the jurors' request under any circumstances, and he denied the motion, ruling the *ex parte* contact was harmless.

II.

Maldonado contends "due process requires that a defendant's request for witness subpoenas be placed under seal and not made available for inspection by the Commonwealth." Underlying this claim is his argument that Rule 3A:12 and Code § 19.2-267 permit the prosecutor to maintain a strategic advantage over defendants because the prosecutor can shelter

- 4 -

the witnesses the prosecutor subpoenas for trial from scrutiny by a defense attorney while the identities of witnesses a defense attorney subpoenas for trial are available for scrutiny. He argues that the procedure in criminal cases allowing prosecutors, and not defense attorneys, the power to directly issue subpoenas gives the Commonwealth an unconstitutional tactical advantage in violation of the Due Process Clause of the Fourteenth Amendment. Thus, he argues the trial judge erred by not granting his motion to place his witness subpoenas under seal.

The Commonwealth contends that Maldonado's argument substantively fails because the Constitution does not provide a "right to proceed in secrecy" or a "right of surprise." The Commonwealth additionally contends Maldonado's claim is not justiciable. Noting the prosecutor proffered at trial that her office had already filed the returns in the clerk's office, the Commonwealth argues Maldonado's attorney could have learned the identities of the Commonwealth's witnesses by looking in the court's file.

Rule 3A:12 mandates, in pertinent part, as follows in criminal proceedings:

> A subpoena for the attendance of a witness to testify before a court not of record shall be issued by the judge, clerk, magistrate, or Commonwealth's attorney. A subpoena for the attendance of a witness to testify before a circuit court or a grand jury shall be issued by the clerk or Commonwealth's attorney.

Similarly, Code § 19.2-267 provides:

> In a criminal case, a summons for a witness may be issued by the attorney for the Commonwealth or other attorney charged with the responsibility for the prosecution of a violation of any ordinance; however, any attorney who issues such a summons shall, at the time of the issuance, file with the clerk of the court the names and addresses of such witnesses.

Applying this statute in Caccioppo v. Commonwealth, 20 Va. App. 534, 537, 458 S.E.2d 592, 594 (1995) (quoting Jamborsky v. Baskins, 247 Va. 506, 511, 442 S.E.2d 636, 638 (1994)), we concluded "that the use of 'shall' in Code § 19.2-269 is 'directory and not mandatory.'" Thus, we held that the Commonwealth's witnesses can testify even if the prosecutor does not file the

witnesses' names and addresses with the court until the day of trial.  Caccioppo, 20 Va. App. at 537-38, 458 S.E.2d at 594.  In view of the holding in Caccioppo, we agree with Maldonado that a defendant does not necessarily have the opportunity to discover whom the Commonwealth plans to call as witnesses.  Yet, a defendant's witnesses, who generally must be subpoenaed upon request through the clerk's office, can be discovered by reviewing the file, giving the Commonwealth the opportunity to interview defense witnesses before trial.

The facts of this case, however, are otherwise.  In response to Maldonado's pretrial motion, the prosecutor proffered that her office had filed the returns of service for its witnesses and, thus, the names of its witnesses were available to Maldonado.  Although Maldonado suggests no evidence in the record supports the Commonwealth's assertion, the rule is well settled that "a unilateral avowal of counsel, if unchallenged, . . . constitutes a proper proffer." Whittaker v. Commonwealth, 217 Va. 966, 969, 234 S.E.2d 79, 81 (1977).  Maldonado did not challenge the Commonwealth's attorney's pretrial proffer; thus, the proffer is part of the record. See Parker v. Commonwealth, 42 Va. App. 358, 369 n.4, 592 S.E.2d 358, 363 n.4 (2004) (reciting as evidence facts "presented to the trial court in the form of an unchallenged proffer by the Commonwealth's attorney").  The trial judge properly accepted the unchallenged avowal of the prosecutor.

The Fourteenth Amendment to the United States Constitution provides that "[n]o State . . . shall deprive any person of life, liberty or property without due process of law."

> "Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." Carey v. Piphus, 435 U.S. 247, 259 (1978).  Due process analysis consists of two steps. See Klimko v. Virginia Employment Comm'n, 216 Va. 750, 754, 222 S.E.2d 559, 563, cert. denied, 429 U.S. 849 (1976).  First, a deprivation of a liberty or property interest must be demonstrated. See J.P. v. Carter, 24 Va. App. 707, 715, 485 S.E.2d 162, 167 (1997).  Then, "'once it is determined that due process applies, the question remains what process is due.'" Id. (quoting Jackson, 14

> Va. App. at 406, 419 S.E.2d at 393-94). "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. . . . The range of interests protected by procedural due process is not infinite." Board of Regents v. Roth, 408 U.S. 564, 569-70 (1972).

O'Banion v. Commonwealth, 30 Va. App. 709, 723, 519 S.E.2d 817, 824 (1999). When an accused claims a due process violation, "[w]e are to determine only whether the action complained of . . . violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' and which define 'the community's sense of fair play and decency.'" United States v. Lovesco, 431 U.S. 783, 790 (1977) (citations omitted).

To establish a claim for violation of due process, Maldonado must show that the procedure he complains of deprived him of his liberty or property interest. Jackson v. W., 14 Va. App. 391, 406, 419 S.E.2d 385, 393 (1992). To make this showing, Maldonado had to offer "more than undeveloped assertions that the requested [procedure] would be beneficial." Caldwell v. Mississippi, 472 U.S. 320, 323 n.1 (1985). As a general rule, when an accused makes "claims of due process deprivations[, courts] require a showing of identifiable prejudice to the accused." Estes v. Texas, 381 U.S. 532, 542 (1965).

Maldonado contends the procedure deprived him of a fair opportunity to present his defense and violated his due process rights because "the Commonwealth ha[d] no obligation to provide to defense counsel the names of her witnesses" but, yet, knew the identity of his witnesses. Maldonado argues the Rule and the statute impermissibly treated the two parties unequally because the Commonwealth's attorney *could have* kept its witness list secret, but he could not. Maldonado asserts he was prejudiced because the pretrial interviews conducted by the police of his witnesses enabled the prosecutor to attempt to impeach some of his witnesses during their testimony based on their statements to the police investigator and cast doubt upon their credibility.

- 7 -

On the facts of this case, Maldonado can make no colorable claim that Rule 3A:12 and Code § 19.2-267 deprived him of due process. The record established that a month prior to trial the names of persons subpoenaed by the prosecutor were in the court's file and were available for inspection by Maldonado's attorney. Maldonado and the Commonwealth's attorney both had the opportunity to learn the identities of the other's witnesses and interview them beforehand to prepare for trial. The trial judge's refusal to deprive the prosecution of the same opportunity that was available to Maldonado did not violate any fundamental notions of justice. Lovesco, 431 U.S. at 790 (holding that the prosecution's delay before indicting the appellant did not deprive him of due process). We hold, therefore, that the trial judge did not deprive Maldonado of his due process rights by denying his motion to place his witness subpoenas under seal.

### III.

Maldonado contends the *ex parte* communication between the jury and the court personnel about a material issue in the case during the jury's deliberation necessitates setting aside the jury's verdict. He argues that the prosecution did not adequately show that the court personnel's *ex parte* communication with the jury was harmless. The Commonwealth responds that the trial judge did not abuse his discretion in denying the motion for a new trial because Maldonado was not prejudiced by the communication. The Commonwealth characterizes the communication as an administrative one, as opposed to a communication pertaining to the matter before the jury. Additionally, the Commonwealth argues that speculation on the jury's perceptions of the communication "are not sufficient to overcome the trial court's findings of fact."

The principle restricting *ex parte* communication with the jury is well settled in Virginia:

> "In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is . . . deemed presumptively prejudicial, if not made in the pursuance of known rules of the

court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, *but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.*"

Scott v. Commonwealth, 11 Va. App. 516, 520, 399 S.E.2d 648, 650 (1990) (quoting Remmer v. United States, 347 U.S. 227, 229 (1954)). Thus, once the defendant shows that an *ex parte* communication occurred about the matter pending before the jury, the burden shifts to the government to prove that the contact was harmless. The Commonwealth does not contest that the communication occurred. The remaining questions are whether the communication pertained to the matter before the jury and whether any error was harmless.

Two instructive cases on whether a communication pertains to the matter pending before the jury are Ellis v. Commonwealth, 227 Va. 419, 317 S.E.2d 479 (1984), and Scott, 11 Va. App. 516, 399 S.E.2d 648. In Ellis, one of the jurors smelled of alcohol and dozed during testimony. 227 Va. at 421, 317 S.E.2d at 480. In chambers, the trial judge privately admonished the juror to stay awake and inquired into the odor of alcohol. Id. Satisfied with the juror's explanation that he had consumed alcohol the day before and his assurance that he would perform his duties as a juror, the judge allowed the juror to remain. Id. The Supreme Court of Virginia held that the *ex parte* communication was "administrative in nature" and did not "'relate[] to some aspect of the trial.'" Id. at 423, 317 S.E.2d at 481 (quoting Rushen v. Spain, 464 U.S. 114, 119 (1983)). Thus, the Court distinguished between administrative matters and matters pending before the jury.

In Scott, the bailiff told the venire panel during *voir dire* that Richmond juries were more lenient than juries in other jurisdictions. 11 Va. App. at 518, 399 S.E.2d at 649. This Court held that those communications were of "constitutionally impermissible" content because they sent an

unmistakable message to the prospective jury members about the discharge of their duties. Id. at 520-21, 399 S.E.2d at 650-51.

We conclude that the circumstances in this case of the court personnel's response to the jury's request for an interpreter are more analogous to the Scott facts than those in Ellis. Here, the jury as a whole directed a communication to the court. It presented a request for an interpreter to aid the jury's deliberations about an exhibit it was given containing dialogue in Spanish. This was not a case where the judge dealt privately with a matter of juror administration. The communication was about the matter pending before the jury and was not one of trial administration.

The government bears a heavy burden in proving an *ex parte* communication was harmless. Id. at 520, 399 S.E.2d at 650.

> The test in a criminal case is not whether the jurors were actually prejudiced by the extraneous matter, but whether they might have been so prejudiced. If they might have been prejudiced, then the purity of the verdict is open to serious doubt and the verdict should be set aside and a new trial awarded.

Thompson v. Commonwealth, 193 Va. 704, 715, 70 S.E.2d 284, 290 (1952); see also Scott, 11 Va. App. at 520, 399 S.E.2d at 650; Evans-Smith v. Commonwealth, 5 Va. App. 188, 207-08, 361 S.E.2d 436, 447 (1987) (holding that the trial judge erred by not questioning the jury about its consideration of extraneous information). Factual findings made by the lower court are entitled to deference, but the ultimate conclusion of harmlessness is one of law. Spain, 464 U.S. at 120.

Maldonado contends the tape recording of the police interview was critical to the case, and argues the trial judge's conclusion that the request would have been denied under any circumstances "fails to account for the role counsel may play in shaping a court's response to a jury inquiry." In determining harmlessness, relevant factors include the matter discussed, the

- 10 -

circumstances surrounding the trial, and the jury members' statements of whether the communication affected their deliberation. See Stockton v. Virginia, 852 F.2d 740, 746 (4th Cir. 1988) (holding that the improper "comment bore on the exact issue" of whether to impose the death penalty or life imprisonment and focusing on how the high-public interest in the case meant the jury might have been influenced by public sentiment); Scott, 11 Va. App. at 521, 399 S.E.2d at 651 (holding that the jurors' statements that they were not influenced were "insufficient, standing alone . . . , to establish harmless error").

The record discloses that both the prosecutor and Maldonado's attorney suggested to the jury the importance of reviewing the recording of the interview. In closing argument, Maldonado's attorney relied on the theory that Maldonado's confession was false because he had been questioned before the taping began and he then responded the way he thought the interviewing police officers wanted. The tape was crucial evidence for the Commonwealth because it contained the confession; however, the defense's theory required the jury give careful attention to the exact language on the tape to dispel the Commonwealth's view that it was a reliable confession. The interpretations given by the deputy and the interpreter differ in several instances. There are significant instances where the court interpreter's translation supported the defense's theory over Deputy Giron's translation on the tape. When Investigator Craig asked, "Did she run away?" Deputy Giron translated the question as, "What happened after that happened? Did she run, did she leave? Did she leave towards her house?" Maldonado answered, "She went towards her house." When Investigator Craig asked, "At this time, is there anything you'd like to say to my supervisor, to the Courts that might listen to this tape?" Deputy Giron told Maldonado, "At this time, if there's anything you want to tell his boss, to the Court, if you feel bad, if you want to say what you're feeling. It is your opportunity now to explain what you feel, what you want to say." The deputy said Maldonado responded, "'please forgive me. I

- 11 -

was drunk.' He is asking forgiveness." The translator said Maldonado said, "Just—I want to say that I'm sorry. I was drunk. I did not know what I did and I feel bad."

In another instance, Deputy Giron interpreted Maldonado's words, "I was a little drunk and it was possible, I believe I opened her pants and he put his hand down in her private area." The interpreter said Maldonado's words were "Well, maybe I was drunk. I don't remember very well. Maybe I opened the pants and lowered my hand."

The record reflects the jury requested the services of the court's interpreter as it considered the exhibit containing dialogue in Spanish. Without informing the trial judge, the employee of the court denied the jury's request for an interpreter to translate a substantive piece of evidence. Thus, the trial judge and the attorneys had no opportunity to consider the request, to frame a response, or to put objections on the record. Furthermore, in view of the emphasis placed by both parties on the importance of the exhibit and the differences that exist in the two translations, we cannot conclude the request could not have affected deliberations and did not prejudice Maldonado.

That the *ex parte* response by the court employee was deemed by the judge, after the fact, to be the response the judge determined he would have given, standing alone, did not render it harmless. We believe the reasoning given by the Maryland Court of Appeals, in rejecting a similar argument, to be persuasive.

> While the answers [the trial judge] gave were substantively correct, the record does not reflect . . . all of the circumstances necessary to be considered in determining whether the petitioner was prejudiced by his, and in this case, his counsel's absence. . . . [N]either the petitioner nor his counsel had . . . any opportunity to have input[] in the answers the jury received. . . . Even more apparent is the fact that, by virtue of their absence, neither was able to protect the record, insure that the petitioner's rights were not compromised and that his case was not prejudiced.

Taylor v. Maryland, 722 A.2d 65, 73 (Md. 1998) (holding that the substantive correctness of the *ex parte* responses did not overcome the presumption of prejudice).

For these reasons, we hold that the Commonwealth failed to meet its burden to show that the communication was harmless. The trial judge therefore erred by not granting the motion for a new trial. Accordingly, we reverse the conviction and remand for a new trial because of the improper *ex parte* communication.

<u>Reversed and remanded.</u>